**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**                                    **FOR PUBLICATION**

In re:

Case No. 12-11384 (MG)

VELO HOLDINGS INC., *et al.*,

Debtors.

**MEMORANDUM OPINION APPROVING THE DEBTORS'**
**KEY EMPLOYEE INCENTIVE PLAN**

*A P P E A R A N C E S:*

DECHERT LLP
*Counsel for the Debtors*
1095 Avenue of the Americas
New York, New York 10036
By:   Michael J. Sage, Esq.
      Shmuel Vasser, Esq.
      Davin J. Hall, Esq.

TACY HOPE DAVIS
*United States Trustee for Region 2*
22 Whitehall Street, 21st Floor
New York, New York 10004
By:   Paul Schwartzberg, Esq.

COOLEY LLP
*Counsel for the Official Committee of Unsecured Creditors*
1114 Avenue of the Americas
New York, New York 10036
By:   Jeffrey L. Cohen, Esq.

WILKIE FARR & GALLAGHER LLP
*Counsel for Barclays Bank PLC, as First Lien Prepetition Agent and DIP Agent*
787 Seventh Avenue
New York, New York 10019
By:   Margot B. Schonholtz, Esq.
      Ana M. Alfonso, Esq.
      Marina I. Zelinsky, Esq.

**MARTIN GLENN**
**UNITED STATES BANKRUPTCY JUDGE**

The Debtors seek approval of a Key Employee Incentive Plan (the "KEIP"), which proposes to set aside approximately $2.875 million in incentive-bonus payments for a number of the Debtors' employees (including insiders) if the Debtors' businesses reach certain financial goals. Such plans have become commonplace in large bankruptcy cases. The United States Trustee (the "U.S. Trustee") filed an objection to the Motion (defined below). In response to that objection, the Debtors filed a reply and additional declarations in support of the Motion, clarifying certain issues raised by the U.S. Trustee. After the hearing on May 29, 2012, the Debtors further amended the KEIP in light of the U.S. Trustee's remaining objections. All but two of the U.S. Trustee's objections have been resolved. For the reasons discussed below, the Court now overrules the U.S. Trustee's remaining two objections and grants the Motion approving the KEIP, as amended.

## I.    BACKGROUND

On April 2, 2012 (the "Petition Date"), the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code. In December 2011, before the bankruptcy, with the assistance of their financial and legal advisors, the Debtors began a comprehensive marketing process attempting to sell all or parts of their business. Ultimately, the Debtors received three bids. After discussions with the advisors for Barclays Bank plc (the "First Lien Agent") and the majority of first lien lenders regarding the range of values and the terms of the bids, the Debtors determined that a financial restructuring supported by the majority of their first lien lenders would provide more value for the Debtors' estates than pursuing any of the bids that had been received. Before the Petition Date, General Electric Capital Corporation, Goldentree Asset Management LP, Chase Lincoln Financial Corporation, and Barclays Bank plc, in their capacity

2

as first lien lenders (collectively with the First Lien Agent, the "Lender Parties"), entered into a chapter 11 case protocol (the "Agreed Protocol") outlining the terms of a proposed restructuring of the Debtors' business and financial affairs and a proposed sale of the Debtors' assets to the Lender Parties.

On May 8, 2012, the Debtors filed the *Debtors' Motion for Entry of an Order Approving the Debtors' Key Employee Incentive Plan* (the "Motion") (ECF Doc. # 130) with the attached declaration of Lorraine DiSanto (the "DiSanto Declaration"). The U.S. Trustee filed an objection to the Motion (the "Objection"). (ECF Doc. # 145.) The Debtors filed a reply, addressing each of the issues raised by the U.S. Trustee. (ECF Doc. # 181.) The Debtors also filed the declarations of Robert A. Campagna Jr. (the "Campagna Declaration") (ECF Doc. # 182) and Vincent DiBenedetto (the "DiBenedetto Declaration"). (ECF Doc. # 214.)[1]

### A. The KEIP Program

In developing the Agreed Protocol, the Debtors discussed the design of the KEIP with their outside advisors and a majority of the Lender Parties (and their advisors). The KEIP includes earnings performance targets (the "Targets") based on the applicable business or sale plan for each business unit. The term sheet for the originally proposed KEIP is attached to the Motion as Exhibit 2.

The KEIP was subsequently amended, and a revised term sheet was filed with the Court. (ECF Doc. # 218.) The amendments include modifications to the proposed service milestones for George Thomas, General Counsel of the Debtors, and the compensation terms for Vincent DiBenedetto, President of Coverdell & Company, Inc. The U.S. Trustee and the Official Committee of Unsecured Creditors (the "Committee") have consented to these modifications.

---

[1] According to the DiBenedetto Declaration, the Senior Vice President and Executive Vice President identified by the U.S. Trustee are "not directors of the Company, nor do they fulfill the functions of Board appointed officers with the authority to set corporate policy." (DiBenedetto Decl. ¶ 6.)

3

The KEIP is separately tailored to three of the Debtors' businesses with specific incentive programs for the following Debtors: (1) FYI Direct, Inc., Brand Magnet, Inc. and Adaptive Marketing LLC, collectively with certain of their non-debtor affiliates (the "ACU Business");[2] (2) Coverdell & Company, Inc., and its non-debtor affiliates ("Coverdell"); and (3) Neverblue Communications, Inc., and certain its non-debtor affiliates ("Neverblue").

### 1. *The Key Employees*

The Debtors estimate that approximately 63 employees would receive payments under the KEIP (the "Key Employees"), of whom five are insider directors or officers under the Bankruptcy Code. The identities of the non-insider KEIP participants were shared with the U.S. Trustee but are not identified in the Motion. These non-insider employee participants will be determined by management (and in the case of the ACU Business, participants will be determined by Alan Jacobs, the Chief Restructuring Officer (the "CRO"), in consultation with the Chief Executive Officer and the Chief Financial Officer). The "insiders" who are proposed KEIP recipients are: (i) Gary Johnson (the Debtors' Chief Executive Officer and a director of the Debtors); (ii) Lorraine DiSanto (the Debtors' Chief Financial Officer and Chief Operating Officer); (iii) George Thomas (the Debtors' General Counsel and a director of certain of the Debtors); (iv) Vincent DiBenedetto (a director and the President of Coverdell & Co.); and (v) Hakan Lindskog (the President of nondebtor affiliate Neverblue Media Company). All other employees who may receive payments under the plan are responsible for running the day-to-day

---

[2] The ACU Business is comprised of the Debtors' credit and identity theft protection and the lifestyle and shopping businesses. According to the Agreed Protocol, the Debtors will continue to operate the ACU Business in the ordinary course, but will cease spending new marketing dollars to acquire new members on a go-forward basis (the "Harvest"). The Harvest is further described in the in the Declaration of Lorraine DiSanto in Accordance with Local Bankruptcy Rule 1007-2. (ECF Doc. # 3.)

4

business operations; they are subordinate employees who report to an officer or an intermediary who reports to an officer.[3]

### 2. *The Targets and Payouts*

The KEIP's base funding level for achieving the applicable Targets is $2.875 million, consisting of $2 million allocated to the ACU Business (the "ACU Target"); $700,000 to Coverdell (the "Coverdell Target"); and $175,000 to Neverblue (the "Neverblue Target"). (Mot. ¶ 18.) Depending on performance, Key Employees will have the ability to earn greater than 100% of the incentive pool Target.

#### a. The ACU Target

The ACU Target will be allocated to employees managing the Harvest of ACU through two separate pools: (i) $600,000 (the "Executive Pool") for Gary Johnson, Lorraine DiSanto, and George Thomas (each, an "Executive Employee") in the aggregate (i.e., $200,000 each); and (ii) $1.4 million for all other Key Employees required to maximize the value of the Harvest (the "Employee Pool"). The Employee Pool will be allocated by the CRO in collaboration with Gary Johnson and Lorraine DiSanto, who will continue to consult with the CRO on adjustments while they are employed by the Debtors. Payouts from the Executive Pool will be based on achieving defined milestones and providing transition services essential to the success of the Harvest. At a minimum, for Executive Employees to earn their KEIP payments, the Debtors must meet the net operating cash flow covenant in section 7.1(a)(ii) of the Debtors' postpetition credit agreement over the initial thirteen weeks of the Debtors' cases (the "DIP Budget"), and the Executive

---

[3] However, the Debtors disclosed that one employee in Coverdell's finance department, Roseanne Corigliano, is the sister of Vincent DiBenedetto and thus is a statutory insider under section 101 of the Bankruptcy Code. Under the proposed KEIP, she would earn $15,000. According to the Debtors, Ms. Corigliano has no corporate authority to dictate policy and is subordinate to the officers and directors of the Debtors.

5

Employees must provide additional transitional services, as described in the Motion. (Mot. ¶ 25.)

Payouts for the rank and file Employee Pool will be distributed based on "Net Proceeds"[4] to creditors as follows:

| Net Proceeds | % of Employee Pool | Cash Payment | Cumulative Cash |
|---|---|---|---|
| $50 million | 75.0% | $1.050 million | $1.050 million |
| $60 million | 87.5% | $0.175 million | $1.225 million |
| $70 million | 100% | $0.175 million | $1.400 million |
| $80 million | 112.5% | $0.175 million | $1.575 million |
| $90 million | 125.0% | $0.175 million | $1.750 million |
| $100 million | 137.5% | $0.175 million | $1.925 million |
| $110 million | 150.0% | $0.175 million | $2.100 million |

b. The Coverdell Target

The $700,000 Coverdell Target will be allocated to Key Employees of Coverdell; amounts per employee will be determined at the discretion of Coverdell's management. (Mot. ¶ 28.) Participants include approximately 27 non-insider employees of Coverdell, as well as Coverdell's President, Vincent DiBenedetto (who also serves as a Director). (*Id.*) Under the revised KEIP, in the event that Coverdell is sold to a third-party purchaser or the Lender Parties for more than $80 million, DiBenedetto's compensation is calculated as a percentage of the Coverdell Net Sale Proceeds; the percentage increases as the range of the Coverdell Net

---

[4] "Net Proceeds" is the unlevered free cash flow from the ACU Business after deducting all recurring and non-recurring cash payments associated with the ACU Business and all post-petition professional fee payments related to the entire restructuring process (excluding the investment banking fees of the proposed investment banker for Coverdell and Neverblue), on an undiscounted basis. The Net Proceeds calculation will be measured from the Petition Date and excludes unlevered free cash flow from Coverdell and Neverblue and the ending cash balance as of the Petition Date.

Sale Proceeds increases. Additionally, the U.S. Trustee negotiated an across-the-board $100,000 reduction in Mr. DiBendetto's compensation under the KEIP.

With respect to the rank and file employees of Coverdell, one of two tests will apply to the allocation of the Coverdell Target. First, if the Lender Parties acquire Coverdell through an $80 million credit bid, or if the Debtors sell Coverdell for less than $80 million, then Coverdell would have to meet revenue and EBITDA targets for participants to receive KEIP compensation. Alternatively, if Coverdell is sold to a third party for $80 million or more, or if the Lender Parties acquire Coverdell under a credit bid in excess of $80 million, then a net sale proceeds calculation applies.[5] Participants would also have the ability to earn more or less than the Coverdell Target based upon performance relative to the revenue and EBITDA targets or the Coverdell Net Sale Proceeds test.

c. The Neverblue Target

The $175,000 proposed allocation to Key Employees of Neverblue will be allocated to approximately eight non-insider employees; the exact participants and incentive amounts will be determined at the discretion of Neverblue's management. Similar to the Coverdell Target, the tests and allocation methods for Key Employees of Neverblue will depend on the facts and circumstances of these cases. First, if the Lender Parties acquire Neverblue through a $20 million credit bid, or if the Debtors sell Neverblue for less than $20 million, then Neverblue would have to meet certain revenue and EBITDA targets for participants to receive KEIP compensation. Alternatively, if Neverblue is sold to a third party for $20 million or more, or

---

[5] "Coverdell Net Sale Proceeds" would be determined by the net cash received by the estate after payment of all expenses in conjunction with a sale transaction of the respective business, or the face amount of a credit bid in excess of $80 million after payment of all expenses in conjunction with the sale transaction.

if the Lender Parties acquire Neverblue under a credit bid in excess of $20 million, then a net sale proceeds calculation would apply.

Finally, with respect to Hakan Lindskog (the President of non-debtor affiliate Neverblue Media Company), if the Lender Parties acquire Neverblue in connection with a $20 million credit bid, then Mr. Lindskog would receive 0.5% of the face amount of the credit bid (or $100,000). If Neverblue is sold to a third-party purchaser, or is acquired by the first lien lenders under a credit bid in excess of $20 million, then he would receive 1% of the proceeds or the face amount of the credit bid. This amount is in addition to the $175,000 allocated for other Key Employees of Neverblue.

According to the Debtors, the KEIP will provide "incentive-based cash awards to the Key Employees who are most capable of maximizing the Debtors' financial performance." (Mot. ¶ 8.) The KEIP was heavily negotiated with the Lender Parties, and, as a result, the secured lenders fully support the KEIP. Additionally, the Committee has not filed an objection.

### B.    The U.S. Trustee's Objection and the Debtors' Reply

The Debtors have worked diligently with the U.S. Trustee, in consultation with the Lender Parties and the Committee, to resolve the Objection. As a result of these discussions and the amendments to the KEIP, only two objections by the U.S. Trustee have *not* been resolved: (1) the objection as to the DIP Budget milestone applicable to the Executive Employees under the ACU Target; and (2) the objection to the sale target for Mr. Hakan Lindskog. Specifically, with respect to the ACU Target, the U.S. Trustee argues that the Executive Employees' bonuses are dependent only on the Debtors' compliance with the DIP Budget. This, according to the U.S. Trustee, does not set an incentive target for management to reach. With respect to the Neverblue

8

Target, according to the U.S. Trustee, no information on what, if anything, Mr. Lindskog is required to do to earn his bonus was included in the information.

After consideration of the evidence and arguments, the Court finds and concludes that the KEIP properly incentivizes all Key Employees, the KEIP meets the requirements of section 503(c) of the Bankruptcy Code, and the KEIP is a valid exercise of the Debtors' business judgment. Whether incentive targets require management to "stretch" to meet performance goals is fundamentally a factual question. On the undisputed evidence submitted in support of the KEIP Motion, the Court expressly finds in the context of this case that the DIP Budget and sales targets indeed require all Key Employees to stretch to achieve the required Targets. Satisfaction for the Targets is by no means assured.

## II.    DISCUSSION

### A.    Insiders

As an initial matter, in evaluating the validity of a key employee incentive plan, the Court must determine whether each eligible employee is an "insider" within the meaning of section 101(31).[6] *See generally In re Borders Grp. Inc.*, 453 B.R. 459 (Bankr. S.D.N.Y. 2011). Insider status is important because it may potentially bar an employee from participating in the KEIP (assuming the program is found to be primarily retentive). If the Court determines that an employee is an insider, then the Debtors must meet the strict requirements of section 503(c)(1).[7]

---

[6]    The Court need not address these issues in full because, as explained below, the Court finds that the KEIP is primarily incentivizing rather than retentive, and thus, the requirements of 503(c)(1) are not applicable.

[7]    Section 503(c)(1) prohibits any transfer

> made to, or an obligation incurred for the benefit of, an insider of the debtor for the purpose of inducing such person to remain with the debtor's business, absent a finding by the court based on evidence in the record that—

9

Although the term "insider" is specifically defined by the Bankruptcy Code, *see* 11 U.S.C. § 101(31)(B), insider status can also be determined on a case-by-case basis from the totality of the circumstances, including the degree of an individual's involvement in a debtor's affairs. *See CPY Co. v. Ameriscribe Corp. (In re Chas. P. Young Co.)*, 145 B.R. 131, 136 (Bankr. S.D.N.Y. 1992). In such cases, insiders must have "at least a controlling interest in the debtor or . . . exercise sufficient authority over the debtor so as to unqualifiably dictate corporate policy and the disposition of corporate assets." *In re Babcock Dairy Co.*, 70 B.R. 657, 661 (Bankr. N.D. Ohio 1986) (citations omitted); *see also In re 9281 Shore Road Owners Corp.*, 187 B.R. 837, 853 (E.D.N.Y. 1995).

Here, the Debtors have disclosed exactly which insiders are participating in the KEIP. Additionally, based on the information provided in the DiBenedetto Declaration, the Court is satisfied that those individuals who originally concerned the U.S. Trustee are not insiders of the Debtors. Thus, the issue the Court must now address is whether the KEIP is valid pursuant to

---

(A) the transfer or obligation is essential to retention of the person because the individual has a bona fide job offer from another business at the same or greater rate of compensation;

(B) the services provided by the person are essential to the survival of the business; and

(C) either—

(i) the amount of the transfer made to, or obligation incurred for the benefit of, the person is not greater than an amount equal to 10 times the amount of the mean transfer or obligation of a similar kind given to nonmanagement employees for any purpose during the calendar year in which the transfer is made or the obligation is incurred; or

(ii) if no such similar transfers were made to, or obligations were incurred for the benefit of, such nonmanagement employees during such calendar year, the amount of the transfer or obligation is not greater than an amount equal to 25 percent of the amount of any similar transfer or obligation made to or incurred for the benefit of such insider for any purpose during the calendar year before the year in which such transfer is made or obligation is incurred;

11 U.S.C. § 503(c)(1).

section 503(c) of the Bankruptcy Code as it relates to both the insider employees of the Debtors and the rank and file employees.

### B.  Pursuant to Section 503(c), the KEIP Is Incentivizing and Not Primarily Retentive

Section 503(c) was added to the Bankruptcy Code as one of the BAPCPA amendments in 2005 to "eradicate the notion that executives were entitled to bonuses simply for staying with the Company through the bankruptcy process." *In re Global Home Prods., LLC*, 369 B.R. 778, 783-84 (Bankr. D. Del. 2007).  The intent of section 503(c) is to "limit the scope of 'key employee retention plans' and other programs providing incentives to management of the debtor as a means of inducing management to remain employed by the debtor."  4 COLLIER ON BANKRUPTCY ¶ 503.17 (15th rev. ed. 2007).  In addition to limiting payments to insiders for retention purposes, section 503 also limits severance payments to insiders and any transaction outside the ordinary course of business that would benefit "officers, managers, and consultants hired after the date of the filing of the petition."  11 U.S.C. § 503(c)(3).  The effect of section 503(c) was to put in place "a set of challenging standards" and "high hurdles" for debtors to overcome before retention bonuses could be paid.  *Global Home*, 369 B.R. at 784-85.  To the extent that either section 503(c)(1) or (c)(2)[8] apply, the transfer cannot be justified solely on the debtor's business judgment.  *In re Dana Corp.*, 351 B.R. 96, 100-01 (Bankr. S.D.N.Y. 2006) ("*Dana I*").  Section 503(c)(3) also prohibits "other transfers or obligations that are outside the ordinary course of

---

[8]  Section 503(c)(2) prohibits severance payments made by a debtor to insiders, unless:

> (A) the payment is part of a program that is generally applicable to all full-time employees; and
>
> (B) the amount of the payment is not greater than 10 times the amount of the mean severance pay given to nonmanagement employees during the calendar year in which the payment is made

11 U.S.C. § 503(c)(2).  Since the KEIP does not contemplate severance payments, this subsection is not applicable.

11

business and not justified by the facts and circumstances of the case, including transfers made to, or obligations incurred for the benefit of, officers, managers, or consultants hired after the date of the filing of the petition." 11 U.S.C. § 503(c)(3).

Section 503(c) does not "foreclose a chapter 11 debtor from *reasonably* compensating employees, including 'insiders,' for their contribution to the debtors' reorganization." *In re Dana Corp.*, 358 B.R. 567, 575 (Bankr. S.D.N.Y. 2007) (citation ommitted) ("*Dana II*"). A transfer to an insider to induce the insider to remain with the debtor's business must satisfy the requirements under subdivisions (A), (B), and (C) of section 503(c)(1) in order to be subject to this subdivision's exception. 4 COLLIER ON BANKRUPTCY ¶ 503.17; *see also Dana II*, 358 B.R. at 575 (summarizing the requirements under 503(c)(1)).

Section 503(c)(1) limits payments to insiders for the purpose of retention and "applies to those employee retention provisions that are essentially 'pay to stay' key employee retention programs." *Dana II*, 358 B.R. at 571. Attempts to characterize what are essentially prohibited retention programs as "incentive" programs in order to bypass the requirements of section 503(c)(1) are looked upon with disfavor, as the courts consider the circumstances under which particular proposals are made, along with the structure of the compensation packages, when determining whether the compensation programs are subject to section 503(c)(1). *See, e.g.*, *Dana I*, 351 B.R. at 102 (stating that if a bonus proposal "walks like a duck (KERP), and quacks like a duck (KERP), it's a duck (KERP)."). Although a purported KEIP may contain some retentive effect, that "does not mean that the plan, overall, is retentive rather than incentivizing in nature." *Id. See also Global Home*, 369 B.R. at 785 ("The entire analysis changes if a bonus plan is not *primarily* motivated to retain personnel or is not in the nature of severance.") (emphasis added); *In re Nellson Nutraceutical, Inc.*, 369 B.R. 787, 802 (Bankr. D. Del. 2007)

12

(reading section 503(c)(1) to mean "a transfer made to . . . an insider of the debtor for the *[primary]* purpose of inducing such person to remain with the debtor's business" because *any* payment made to an employee, including regular wages, has at least a partial retentive effect). As stated earlier, all of the Executive Employees subject to the KEIP are insiders. Therefore, if the Court concludes that the KEIP is essentially a retention plan, then such payments must comply with section 503(c)(1).

In *Dana II*, Judge Lifland held that "[b]y presenting an executive compensation package that properly incentivizes [management] to produce and increase the value of the estate, the Debtors have established that section 503(c)(1) does not apply." 358 B.R. at 584. However, prior to *Dana II*, Judge Lifland found that "without tying [a] portion of [a] bonus to anything other than staying with the company until the Effective Date, this Court cannot categorize a bonus of this . . . form as an incentive bonus." *Dana I*, 351 B.R. at 102. In *Mesa Air Group*, this Court held that the debtors' incentive bonus program was not a retention bonus because it was designed to "motivate the employees to achieve performance goals." *In re Mesa Air Grp.*, No. 10-10018, 2010 WL 3810899, at *4 (Bankr. S.D.N.Y. Sept. 24, 2010) (citation omitted). In that case, incentive bonuses were tied to certain performance goals, such as maintenance of flight schedules, efficient return of aircraft, securing aircraft equipment at reduced rates and negotiating reduced rates for aircraft no longer in service. *Id.*

The U.S. Trustee asserts that the KEIP in this case is not primarily incentive-based because the ACU Target is predominantly tied to the Debtors' compliance with the DIP Budget. However, this financial target "was developed in conjunction with the projected revenue and EBITDA targets of Coverdell and Neverblue, and expected range of recovery of the ACU Business," and, thus, this target "measures the same performance targets set for the Debtors'

13

businesses . . . ." (Campagna Decl. ¶¶ 35-36.)  Furthermore, under the KEIP, the Executive Employees are required to *do more* to meet the wide-scale goals outlined in the KEIP as they must address concerns and issues that are unique to the bankruptcy proceeding.  The KEIP encourages the Executive Employees to increase their pre-bankruptcy job responsibilities to achieve the bonus requirements and financial targets.  Accordingly, the Court is satisfied that through the use of the Targets, the KEIP conforms to prevailing practices in this district and others, thereby alleviating the need for a section 503(c)(1) analysis.  *See In re BearingPoint, Inc.*, Case No. 09-10691 (REG) (Bankr. S.D.N.Y. July 24, 2009) (ECF Doc. # 1128) (incentives based on (i) the sale of business units, (ii) employees working on estate transition and wind-down activities and (iii) percentage of creditor recoveries); *In re Calpine Corp.*, Case No. 05-60200 (BRL) (Bankr. S.D.N.Y. May 15, 2006) (ECF Doc. # 1580) (size of incentive pool tied to the debtor's market adjusted enterprise value and plan adjusted enterprise value); *In re Nortel Networks, Inc.*, Case No. 09-10138 (KG) (Bankr. D. Del. Mar. 5 and 20, 2009) (ECF Doc. ## 436, 511) (incentive plan based on the achievement of separate milestones, including a cost reduction plan, "certain parameters . . . that will result in a leaner and more focused organization" and plan confirmation).

   Furthermore, in previous years, the Debtors utilized revenue and EBITDA targets as a means for incentive-based pay for their employees. (Campagna Decl. ¶ 18.)  Historically, these targets have proven difficult to achieve. (*Id.* ¶ 19-21.)  And, according to representations from counsel for the Debtors, the Debtors have yet to meet the Targets.  *See Dana II*, 358 B.R. at 583 (noting that the financial benchmarks set for debtor's incentive plan are difficult targets to achieve and are therefore incentivizing); WEBSTER'S NINTH NEW COLLEGIATE DICTIONARY 608 (9th ed. 1984) (defining "incentive" to mean "something that incites or has a tendency to incite

14

to determination or action"). Additionally, as explained in the Campagna Declaration, the Court is satisfied that the $80 million and $20 million are fair baseline target sale amounts for Coverdell and Neverblue, respectively, in connection with the KEIP. (Campagna Decl. ¶¶ 22, 25, 27.) Thus, the Court finds that the KEIP Targets will properly incentivize all of the Key Employees.

The Court also finds that the Targets and payments applicable to Hakan Lindskog primarily incentivize him to perform at the highest level. Under the KEIP, Mr. Lindskog would be paid 0.5% of the face amount of a $20 million credit bid or 1% of sales proceeds from a third-party purchaser for Neverblue. Mr. Lindskog must work diligently with the Debtors' investment banker to find a third-party purchaser and work with proposed buyers, responding to due diligence requests and providing business and financial information. (*Id.* ¶ 28.) Furthermore, pursuant to his employment agreement, Mr. Lindskog is actually entitled to receive 1% of the proceeds of a sale or change of control transaction of Neverblue. (*Id.* ¶ 29.) Thus, the incentives as applied to him under the KEIP will actually force Mr. Lindskog to perform at the highest level for Neverblue to command a price in excess of $20 million.

The KEIP's goals are also consistent with the policies underlying chapter 11. While an expeditious emergence from bankruptcy via a confirmed reorganization plan is the ultimate objective of most chapter 11 debtors, a sale of a debtor's business as a going concern under section 363 also achieves the chapter 11 goal of preserving businesses and maximizing recoveries for creditors. *See Bank of Am. Nat'l Trust & Sav. Ass'n. v. 203 N. LaSalle St. P'ship*, 506 U.S. 434, 453 (1999) (noting that the two basic purposes of chapter 11 are to preserve going concerns and maximize property available to satisfy the claims of creditors). Meeting these

benchmarks is also beneficial to the estate because an expedited emergence will minimize administrative costs, thereby helping to maximize stakeholder value.

### C. The Debtors Have Exercised Sound Business Judgment

The alternative method for approving the KEIP is as an "ordinary course" transaction by the Debtors pursuant to 11 U.S.C. § 363. *See In re Mesa Air Grp.*, 2010 WL 3810899, at *3. While the Bankruptcy Code does not provide guidance whether a particular transaction is conducted in the "ordinary course of business," courts have applied both "horizontal" and "vertical" tests to consider the reasonableness of a transaction and whether it was conducted in the ordinary course. As stated by Judge Beatty,

> [t]he inquiry deemed horizontal is whether, from an industry-wide perspective, the transaction is of the sort commonly undertaken by companies in that industry. The inquiry deemed vertical analyzes the transactions 'from the vantage point of a hypothetical creditor and [the inquiry is] whether the transaction subjects a creditor to economic risk of a nature different from those he accepted when he decided to extend credit.'

*In re Crystal Apparel, Inc.*, 207 B.R. 406, 409 (Bankr. S.D.N.Y. 1997) (citation omitted); *see also Dana II*, 358 B.R. at 580 (citing *Crystal Apparel* with approval). The horizontal test "is aimed at determining whether the transaction is abnormal or unusual, in which case it is probably not in the ordinary course of business, or whether it is a reasonably common type of transaction." 3 COLLIER ON BANKRUPTCY ¶ 363.17. The vertical test "reviews the transaction from the perspective of creditors, asking whether the transaction is one that creditors would reasonably expect the debtor or trustee to enter into." *Id.*

If a particular transaction passes the horizontal and vertical tests, it is then considered an "ordinary course" transaction subject to approval under section 363. As an ordinary course transaction, the inquiry is then whether the debtor has a valid business purpose for engaging in the particular transaction, and whether "the conduct involves a business judgment made in good

16

faith upon a reasonable basis and within the scope of authority under the Bankruptcy Code." *In re Nellson Nutraceutical, Inc.*, 369 B.R. at 799.

Section 503(c)(3) limits payments made to the Debtors' employees outside of the ordinary course unless such payments are justified by "the facts and circumstances of the case." 11 U.S.C. § 503(c)(3). Courts have held that the "facts and circumstances" language of section 503(c)(3) creates a standard no different than the business judgment standard under section 363(b). *See Dana II*, 358 B.R. at 576; *Global Home*, 369 B.R. at 783 ("If [the proposed plans are] intended to incentivize management, the analysis utilizes the more liberal business judgment review under § 363."); *Mesa Air Grp.*, 2010 WL 3810899 at *4; *In re Nobex Corp.*, No. 05-20050, 2006 WL 4063024, at *2 (Bankr. D. Del. Jan. 19, 2006). In *Dana II*, Judge Lifland listed several factors that courts consider when determining if the structure of a compensation proposal and the process for its development meet the business judgment test:

- Is there a reasonable relationship between the plan proposed and the results to be obtained, i.e., will the key employee stay for as long as it takes for the debtor to reorganize or market its assets, or, in the case of a performance incentive, *is the plan calculated to achieve the desired performance?*
- Is the cost of the plan reasonable in the context of the debtor's assets, liabilities and earning potential?
- Is the scope of the plan fair and reasonable; does it apply to all employees; does it discriminate unfairly?
- Is the plan or proposal consistent with industry standards?
- What were the due diligence efforts of the debtor in investigating the need for a plan; analyzing which key employees need to be incentivized; what is available; what is generally applicable in a particular industry?
- Did the debtor receive independent counsel in performing due diligence and in creating and authorizing the incentive compensation?

358 B.R. at 576-77 (emphasis in original). *See also Global Home*, 369 B.R. at 786 (evaluating an incentive plan under the business judgment standard of section 363 by applying the factors

17

listed above); *but see In re Pilgrim's Pride Corp.*, 401 B.R. 229, 236-37 (Bankr. N.D. Tex. 2009) (standard for approval under section 503(c)(3) is higher than the business judgment test; if payments to employees outside the ordinary course were only subject to the business judgment test, then the language of section 503(c)(3) would ostensibly be rendered meaningless).

As an initial matter, the Debtors have adequately shown that the incentives and Targets proposed under the KEIP are the same as those that have been established by the Debtors in previous years. (Campagna Decl. ¶¶ 18-20.) Further, applying the *Dana II* factors, the Court finds that the Debtors have exercised sound business judgment. A reasonable relationship exists between the plan proposed and the results to be obtained. In this case, the KEIP is keyed to the successful sale of the Debtors' businesses to a third-party purchaser. The KEIP is also reasonable in light of the Debtors' financial situation. Assuming the Debtors meet their performance goals, the aggregate KEIP payments are $2.875 million. (*Id.* ¶ 15.) Additionally, the KEIP does not unfairly discriminate and comports with industry standards, as it is nearly identical to the bonus plan that the Debtors had in place prepetition. (*Id.* ¶¶ 18-20.) Finally, the Debtors, as evidenced by the declarations filed in support of the KEIP, have exercised proper diligence in formulating the KEIP. Specifically, the Debtors have utilized their financial advisor, Alvarez & Marsal North America, LLC, to assist, advise and guide the Debtors in developing a KEIP that would incentivize the Key Employees to maximize the value of the Harvest and the sales of Coverdell and Neverblue.

### III. CONCLUSION

For the reasons stated above, the Court overrules the U.S. Trustee's remaining objections. The Debtors have met their burden of proving that the proposed KEIP is primarily incentive-based as it relates to all Key Employees and is a valid exercise of their sound business judgment under section 363 and 503(c)(3). A separate order will be entered approving the Motion.

Date:   June 6, 2012
        New York, New York

                                                  **/s/Martin Glenn**
                                                  MARTIN GLENN
                                  United States Bankruptcy Judge